Eugene DUVALL; Patricia Sue Duvall,
Plaintiffs–Appellants,

v.

BRISTOL–MYERS–SQUIBB COMPANY,
a Delaware Corporation; Medical Engineering Corporation, a/k/a Surgitek/Medical Engineering Corporation,
Defendants–Appellees.

Food & Drug Administration,
Amicus Curiae.

No. 94–1520.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 1, 1994.

Decided Sept. 25, 1995.

**ARGUED:** Gary Lester Wilson, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for appellants. William James Murphy, Murphy & Shaffer, Baltimore, MD, for appellees. **ON BRIEF:** Bruce Finzen, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN; David B. Shapiro, Baltimore, MD; Lewis J. Saul, Bethesda, MD, for appellants. Robert T. Shaffer, III, Murphy & Shaffer, Baltimore, MD; John F. Brenner, McCarter & English, Newark, NJ, for appellees.

Before WIDENER and WILKINS, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed in part and reversed and remanded in part by published opinion. Judge WILKINS wrote the opinion, in which Judge WIDENER and Judge MICHAEL joined.

## OPINION

WILKINS, Circuit Judge:

Eugene Duvall appeals a decision of the district court granting summary judgment to Bristol–Myers Squibb Company (Bristol–Myers)[1] on the basis that Duvall's claims are preempted by 21 U.S.C.A. § 360k (West Supp.1995), enacted as a part of the Medical Device Amendments of 1976 (MDA) to the Federal Food, Drug, and Cosmetic Act.[2] We affirm the district court with respect to the majority of Duvall's claims. However, because we conclude that § 360k does not preempt Duvall's express warranty claim to the extent that it may be based on Bristol–Myers' voluntarily-made representations regarding its product, we reverse in part and remand for further proceedings.

### I.

In 1990, Duvall underwent surgery to implant a penile prosthesis as treatment for erectile impotence. The prosthesis, a "Surgitek Uni–Flate 1000," was manufactured and marketed by Bristol–Myers. The device ultimately failed and was explanted two years later. Duvall filed suit against Bristol–Myers in state court, claiming breach of express warranty; breach of implied warranties of merchantability and fitness for a particular purpose; strict liability for defective design, defective manufacture, and failure to warn; and negligence in design, manufacture, marketing, testing, promotion, and sale. Bristol–Myers removed the action to federal court on the basis of diversity of citizenship.

█ The district court, noting its recent decision in *Griffin v. Medtronic, Inc.*, 840 F.Supp. 396 (D.Md.1994) (holding that the MDA preempted state-law claims involving a medical device marketed after premarket approval), *appeal docketed*, No. 94–1219 (4th Cir. Feb. 23, 1994), granted Bristol–Myers' motion for summary judgment, ruling that all of Duvall's state-law claims were preempted by § 360k of the MDA. The material facts are not in dispute, and the issues before us are questions of law subject to de novo review. *Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1166–67 (4th Cir.1988).

### II.

Congress established a scheme for comprehensive regulation of medical devices in the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 14 (1st Cir.1994). The MDA authorizes the Food and Drug Administration (FDA) to classify medical devices intended for human use into three categories "based on the degree of regulation necessary to assure safety and effectiveness." *Id.; see* 21 U.S.C.A. § 360c (West Supp.1995). Class I devices, such as tongue depressors, which do not present an unreasonable risk of illness or

---

1. Duvall filed suit against Bristol–Myers and its wholly-owned subsidiary, Medical Engineering Corporation. We refer to both as Bristol–Myers.

2. Patricia Duvall, Duvall's wife, also appeals the decision of the district court granting summary judgment to Bristol–Myers on her claim for loss of consortium. We address her claim separately below.

injury, are subject only to general controls. 21 U.S.C.A. § 360c(a)(1)(A); 21 C.F.R. § 880.6230 (1994). Class II devices, such as bone-conduction hearing aids, for which "general controls by themselves are insufficient to provide reasonable assurance of the safety and effectiveness of the device," are subject to special controls. 21 U.S.C.A. § 360c(a)(1)(B); 21 C.F.R. § 874.3300 (1994). Class III devices are those devices: (1) for which there is insufficient information to determine that the controls applicable to Class I and II devices are alone enough to provide reasonable assurance of the safety and effectiveness of the device; and (2)(a) that are to be used for "supporting or sustaining human life" or that are "of substantial importance in preventing impairment of human health" or (2)(b) that "present[ ] a potential unreasonable risk of illness or injury." 21 U.S.C.A. § 360c(a)(1)(C). This class of devices is subject to the most stringent MDA controls. *See King v. Collagen Corp.*, 983 F.2d 1130, 1131 (1st Cir.) (Torruella, J.), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993). Class III devices include implantable pacemakers and replacement heart valves. 21 C.F.R. §§ 870.3610, 870.3925 (1994). Penile inflatable implants are classified as Class III medical devices. 21 C.F.R. § 876.3350 (1994).

█ In order to market a Class III device, a manufacturer generally must obtain premarket approval from the FDA. Premarket approval requires submission of a detailed application, including clinical data, manufacturing processes, and proposed labeling, *see* 21 U.S.C.A. § 360e(c) (West Supp.1995), and is intended "to provide reasonable assurance of [the] safety and effectiveness" of the device, 21 U.S.C.A. § 360c(a)(1)(C). In the case of a Class III device for which the FDA does not yet require premarket approval, the manufacturer may market the item after showing that it is "substantially equivalent" to a device marketed before the effective date of the MDA. *See* 21 C.F.R. § 807.100(a) (1994); *Mendes,* 18 F.3d at 14–15. To do so, 90 days before marketing a device a manufacturer must submit a premarket notifica-

tion, known as a 510(k) Notification, including specified information; the FDA must then clear the device for marketing. 21 U.S.C.A. § 360(k) (West Supp.1995); 21 C.F.R. §§ 807.87, 807.90, 807.100 (1994).

Bristol–Myers' prosthesis reached the market through the substantial equivalence process. Upon completion of clinical trials of the device under an investigational device exemption (IDE), *see* 21 U.S.C.A. § 360j(g) (West Supp.1995), Bristol–Myers submitted a 510(k) Notification that included information relating to the design and engineering of the device, clinical studies under the IDE, the similarity of the device to other penile prostheses marketed before passage of the MDA, and proposed packaging, labeling, and use instructions. At the FDA's request, Bristol–Myers supplied additional information on sterilization techniques, testing protocols, design of specific components of the device, package inserts, indicated uses, and fluid requirements. The FDA later cleared the device for marketing.

### III.

Duvall argues that his state-law claims are not preempted by § 360k for two reasons. He first maintains that § 360k preempts only state-imposed requirements with respect to medical devices that are different from or additional to those of the MDA and that because common-law claims do not impose requirements, they are not preempted. Although we agree with Duvall that § 360k preempts only state-imposed requirements, we cannot agree that common-law claims are not requirements within the meaning of § 360k. Second, Duvall contends that even if § 360k preempts state requirements imposed by judicial decision, any requirements applicable to Bristol–Myers' prosthesis under the MDA do not give rise to preemption.

### A.

█ The doctrine of preemption is based on the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2.[3] It has been clear since *M'Culloch v. Ma-*

---

**3.** "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any

*ryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), that a state law is invalid to the extent that it conflicts with federal legislation. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 515–16, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (plurality). However, preemption should not be found too readily; "'the historic police powers of the States [are] not to be superseded ... unless that [is] the clear and manifest purpose of Congress.'" *Id.* (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

■ A federal law preempts a state law in any of several situations. For example, state law is preempted when Congress expressly so provides, *see Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977); when federal regulation of a legislative field is so comprehensive that there is no room for supplementary state regulation, *see Rice,* 331 U.S. at 230, 67 S.Ct. at 1152; or when the state law is in actual conflict with a federal provision, *see Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Because Congress included an express preemption provision in the MDA, we need address only the scope of the statutory language. *See Cipollone,* 505 U.S. at 517–18, 112 S.Ct. at 2618 (inclusion of an express preemption provision implies that matters beyond the reach of the provision are not preempted).

■ Section 360k of the MDA provides in pertinent part:

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other

State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

matter included in a requirement applicable to the device under this chapter.

21 U.S.C.A. § 360k(a).[4] The language of this section expressly reveals congressional intent that the MDA preempt state-imposed requirements that are different from or additional to those applicable to the device under Chapter 9 of Title 21 and that relate either to the safety or effectiveness of the device or to other matters encompassed in requirements applicable to the device under Chapter 9 of Title 21. The question then becomes whether state-law claims may impose requirements within the meaning of § 360k. We conclude that they may.

■ In *Cipollone,* the Supreme Court addressed the question of whether state common-law claims against a cigarette manufacturer were preempted by § 5(b) of the Public Health Cigarette Smoking Act of 1969, which provided that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Cipollone,* 505 U.S. at 515, 112 S.Ct. at 2617 (internal quotation marks omitted). A plurality of the Court concluded that the phrase "requirement or prohibition" necessarily included common-law claims:

The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

*Id.,* 505 U.S. at 521, 112 S.Ct. at 2620 (alteration in original) (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)).

4. States and local governments may apply for an exemption to § 360k(a) in specified circumstances. *See* 21 U.S.C.A. § 360k(b).

Moreover, the plurality noted, damages actions predicated upon state common-law duties impose requirements under state law. *Id.* at 521–24, 112 S.Ct. at 2620–21. Thus, the plurality determined that common-law claims were requirements within the plain language of the provision and were preempted to the extent that they were within the scope of the preemption provision. *Id.* at 523–24, 112 S.Ct. at 2621. Because of the similarity between the language of § 360k and the statute at issue in *Cipollone,* we conclude that the plain language of the MDA mandates the same conclusion with respect to the use of the term "requirement" in that statute. *See Gile v. Optical Radiation Corp.,* 22 F.3d 540, 542 (3d Cir.) ("[T]he Supreme Court has clearly stated that the word 're-quirement,' in the context of an express preemption provision, includes state law claims."), *cert. denied,* —— U.S. ——, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994).

In addition, we note that the FDA interprets the word "requirement" in § 360k to include duties imposed by state common law:

> [N]o State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, *or court decision* ), which is different from, or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

21 C.F.R. § 808.1(b) (1994) (emphasis added). The interpretation of § 360k to include requirements "established by ... court decision" is reasonable. Accordingly, had we not already determined that the plain language of § 360k compels the conclusion that the term "requirement" includes court decisions, we would defer to the interpretation offered by the FDA. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

Further, other courts of appeals uniformly have concluded that state-law claims are within the preemptive scope of § 360k. *See, e.g., National Bank of Commerce of El Dorado v. Kimberly–Clark Corp.,* 38 F.3d 988, 991–92 (8th Cir.1994); *Gile,* 22 F.3d at 542; *Mendes,* 18 F.3d at 16; *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1421 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993).

We therefore conclude that state-law claims are preempted by § 360k to the extent that, if successful, such claims would impose requirements under state law different from or in addition to requirements applicable to a device under the MDA.

### B.

Duvall next argues that even if state common-law claims impose requirements within the meaning of § 360k, that provision nonetheless does not preempt his claims because there is no requirement applicable to Bristol–Myers' prosthesis under Chapter 9 of Title 21 from which a state-imposed requirement would differ. Duvall maintains that state-law claims are preempted only when the FDA has adopted specific requirements applicable to a single device or class of devices. In support of this argument, Duvall points to 21 C.F.R. § 808.1(d) (1994), which interprets the phrase "any requirement applicable ... to the device" and which provides that:

> State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

Because the FDA has not adopted specific provisions with respect to penile prostheses, Duvall maintains, § 360k does not protect Bristol–Myers from liability under state law.

In analyzing Duvall's argument, we must first determine whether the phrase "any requirement applicable ... to the device" in § 360k is ambiguous, thus opening the door for agency interpretation. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 ("If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). If so, we must then consider whether the interpretation offered by the FDA is a reasonable one. *Id.* at 844, 104 S.Ct. at 2782–83.

▪ Under *Chevron*, a court should defer to an agency's reasonable interpretation of a statute "if the statute is silent or ambiguous with respect to the specific issue." *Id.* at 843, 104 S.Ct. at 2782. However, we conclude that § 360k is not silent or ambiguous with respect to which requirements under the MDA give rise to preemption. The section plainly provides that *any* requirement that is applicable to the device preempts a different or additional state-imposed requirement.[5] Therefore, we do not consider the FDA's interpretation of the statute.

▪ Bristol–Myers argues that there are two sources of requirements applicable to its prosthesis under the MDA: the good manufacturing practice (GMP) and labeling requirements, found in 21 C.F.R. pts. 801 and 820 (1994); and the 510(k) Notification.[6]

▪ The GMP requirements include, *inter alia*, standards for production facilities, quality assurance, monitoring of package labels, and device failure reporting requirements.

*See* 21 C.F.R. pt. 820. The labeling requirements mandate the content of labels and the prominence of required statements. *See* 21 C.F.R. pt. 801. Under the plain, unambiguous language of § 360k, these are clearly requirements applicable to Bristol–Myers' prosthesis under the MDA. They therefore give rise to preemption. *See Mendes,* 18 F.3d at 18–19. *But see Oja v. Howmedica, Inc.,* 848 F.Supp. 905, 906–07 (D.Colo.1994).

▪ A 510(k) Notification also imposes requirements on the device. The FDA mandates that a 510(k) Notification include, *inter alia,* "[p]roposed labels, labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use"; a statement indicating the similarity of the device to currently marketed devices (including data to support the statement, such as information on similarity in materials and design); and additional information as requested by the FDA. 21 C.F.R. § 807.87. And, if Bristol–Myers wishes to change substantially the design, components, or manufacturing processes used in making the device, it must submit a new 510(k) Notification. 21 C.F.R. § 807.81(a)(3). The FDA's determination that Bristol–Myers' prosthesis is substantially equivalent to those previously marketed thus binds Bristol–Myers to its representations to the FDA; for all intents

---

**5.** We note that every circuit court to have examined this question has determined that § 808.1(d) is a reasonable interpretation of § 360k. *See, e.g., Martello v. Ciba Vision Corp.,* 42 F.3d 1167, 1168 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995); *National Bank of Commerce,* 38 F.3d at 997; *Stamps,* 984 F.2d at 1424 n. 8; *cf. Mendes,* 18 F.3d at 16 (relying in part on § 808.1(d) without explicitly determining that it is a reasonable interpretation of § 360k). However, none of these courts have addressed the preliminary question required by *Chevron* of whether the statutory language is silent or ambiguous with respect to the question at issue. Because § 360k is not ambiguous, we need not consider whether § 808.1(d) is a reasonable interpretation of the statute.

**6.** Bristol–Myers also contends that the regulation classifying penile inflatable implants as Class III devices, *see* 21 C.F.R. § 876.3350, is a requirement applicable to the device under the MDA. We disagree. The classification of penile inflatable implants as Class III medical devices is not a requirement applicable to the device for the sim-

ple reason that the classification regulation does not itself require Bristol–Myers to do (or not to do) anything. Rather, the regulation merely describes penile inflatable implants, states that they are in Class III, and provides that premarket approval is not yet required. *See* 21 C.F.R. § 876.3350. In short, although classification of Bristol–Myers' prosthesis as a Class III device may result in certain requirements being imposed upon it, the classification itself is not one of those requirements. *Cf. Elbert v. Howmedica, Inc.,* 841 F.Supp. 327, 331 (D.Haw.1993) (regulation classifying knee prostheses as Class II devices is not a requirement giving rise to preemption). *But see Anguiano v. E.I. DuPont De Nemours & Co.,* 44 F.3d 806, 810 (9th Cir.1995) (dicta) ("Because of the more extensive requirements imposed on Class III devices, the MDA preempts state law regarding a Class III device even if the only MDA regulation specifically addressing the device is an identification regulation."); *Cameron v. Howmedica, Div. of Pfizer Hosp. Prods. Group, Inc.,* 820 F.Supp. 317, 320–21 (E.D.Mich.1993) (regulation placing hip replacement devices in Class III is a requirement giving rise to preemption).

and purposes, Bristol–Myers is required to continue to design, manufacture, and label the device as proposed in its original 510(k) Notification. We therefore conclude that 510(k) Notification is a requirement applicable to the device under the MDA. *See Reeves v. AcroMed Corp.,* 44 F.3d 300, 305 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2251, 132 L.Ed.2d 258 (1995); *Bokis v. American Medical Sys., Inc.,* 875 F.Supp. 748, 754–55 (W.D.Okla.1995).

## IV.

■■■ Duvall concedes that if § 360k encompasses common-law claims, and if the MDA imposes requirements on Bristol–Myers' prosthesis, the majority of his claims are preempted.[7] However, Duvall separately argues that his express warranty claim, which is based on Bristol–Myers' brochure for the prosthesis and representations allegedly made by a Bristol–Myers employee, survives preemption under the reasoning of the Supreme Court in *Cipollone.* There is significant disagreement among federal courts as to whether express warranty claims are preempted by § 360k. *Compare King,* 983 F.2d at 1135 (express warranty claim preempted) *with Michael v. Shiley, Inc.,* 46 F.3d 1316, 1325–28 (3d Cir.1995) (express warranty claim not preempted), *cert. denied,* —— U.S. ——, 116 S.Ct. 67, —— L.Ed.2d —— (1995) *and Richman v. W.L. Gore & Assocs., Inc.,* 881 F.Supp. 895, 905 (S.D.N.Y.1995) ("Although some express warranties may be preempted, . . . this Court cannot conclude that all possible express warranties are preempted."). We hold that although § 360k preempts express warranty claims to the extent that they are based on FDA–mandated labeling, packaging, and advertising, it does not preempt an express warranty claim that

is based on a manufacturer's voluntarily-made representations regarding its product.

Our analysis of this issue is guided by the reasoning of the Supreme Court in *Cipollone* and our decision in *Worm v. American Cyanamid Co.,* 5 F.3d 744 (4th Cir.1993) (*Worm II*). In *Cipollone,* the plaintiff brought an express warranty claim against a cigarette manufacturer based on certain claims made to his deceased mother in its advertisements. *Cipollone,* 505 U.S. at 525–26, 112 S.Ct. at 2622. The plurality concluded that the express warranty claim was not preempted because an express warranty is at its core "a contractual commitment voluntarily undertaken." *Id.* at 525–26 & n. 23, 112 S.Ct. at 2622 & n. 23. "A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the 'requirements' imposed by an express warranty are not 'imposed under State law,' but rather imposed *by the warrantor.*" *Id.* at 525–26, 112 S.Ct. at 2622.

■■■ In *Worm II,* we addressed the question of whether express warranty claims under Maryland law were preempted by a provision of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) that prohibited the imposition by a state of " 'any requirements for labeling or packaging [herbicides] *in addition to or different from* those required under this subchapter.' " *Worm II,* 5 F.3d at 747 (alteration in original) (quoting 7 U.S.C.A. § 136v(b) (West Supp.1995)). Relying on *Cipollone* and noting that Appellants had failed to point to any "statement made by [Appellee] other than that required and approved by the" Environmental Protection Agency (EPA), we concluded that the express warranty claim was preempted because it was based on labeling mandated by the EPA pursuant to FIFRA. *Id.* at 749.[8] Based on *Cipollone* and *Worm*

---

**7.** Duvall also asserts that Bristol–Myers has failed to comply with certain reporting requirements imposed under 21 C.F.R. pt. 820. Because of this noncompliance, Duvall argues, Bristol–Myers may not claim preemption. We need not decide whether Bristol–Myers' alleged failure to comply with FDA reporting requirements would prevent it from claiming preemption because Duvall did not present this question to the district court, and there is insufficient

evidence of Bristol–Myers' noncompliance to survive summary judgment.

**8.** We disagree with the Third Circuit that the reasoning of *Worm II* does not apply to a determination of whether an express warranty claim is preempted by § 360k simply because *Worm II* involved "a separate statutory scheme." *Michael,* 46 F.3d at 1327. The relevant language of 7 U.S.C.A. § 136v(b) and § 360k is virtually iden-

*II*, we hold that Duvall's express warranty claim is preempted to the extent that it is based on FDA–mandated labeling, packaging, or advertising. The MDA requires manufacturers of medical devices to submit proposed labels, advertisements, and package inserts for FDA inspection and regulates the form and appearance of package labels. *See* 21 C.F.R. pt. 801; 21 C.F.R. § 807.87(e). And, a manufacturer is required to resubmit its 510(k) Notification if the device will be "significantly changed or modified." 21 C.F.R. § 807.81(a)(3). A significant change is "[a] change or modification in the device that could significantly affect the safety or effectiveness of the device" or "[a] major change or modification in the intended use of the device." 21 C.F.R. § 807.81(a)(3)(i), (ii). Since many, if not all, such changes will be reflected in the labeling, packaging, and advertising of the device, it is not unreasonable to conclude that—as in *Worm II*—the statements made by Bristol–Myers in the labeling and packaging of its device effectively were mandated by the FDA because they could not be changed significantly without prior notification to the FDA. *See Kemp v. Pfizer, Inc.*, 851 F.Supp. 269, 273 (E.D.Mich.1994) ("[G]iven the extensive control of the FDA, it would not be inaccurate to assert that the warranties and labeling utilized by [the manufacturer] were imposed upon [it] by federal regulators."). Therefore, Duvall's express warranty claim is preempted to the extent that it is based on FDA-mandated labeling, packaging, and advertising of Bristol–Myers' prosthesis because any promises contained therein were not made voluntarily. *See Cipollone*, 505 U.S. at 525–26, 112 S.Ct. at 2622; *Worm II*, 5 F.3d at 749.[9]

We also hold, however, that an express warranty claim is not preempted if it is based on promises made by Bristol–Myers separate and apart from FDA-mandated labeling, packaging, or advertising. And, because these express warranty claims are based upon voluntary promises made by the warrantor, not upon duties imposed under state law, they are not requirements imposed under state law. We therefore conclude that the district court erred in determining that Duvall's express warranty claim is preempted insofar as it is based on Bristol–Myers' voluntarily-made promises.

### V.

Section 360k of the MDA provides for preemption whenever a state requirement would impose an obligation on a medical device manufacturer that is different from or in addition to any requirement applicable to the device under the MDA. With the possible exception of the express warranty claim, all of Duvall's state-law claims would impose different or additional requirements under state law and are therefore preempted. Because we conclude that an express warranty claim is not preempted when it is based on a manufacturer's voluntarily-made representations regarding its product, we reverse in part and remand for further proceedings not inconsistent with this opinion.[10]

*AFFIRMED IN PART; REVERSED AND REMANDED IN PART.*

---

tical; thus, we perceive no sound basis on which to distinguish *Worm II*.

9. The FDA, as amicus curiae, maintains that under *Cipollone* the relevant inquiry is not whether a statement made by a manufacturer was voluntary or was mandated by the government, but rather whether the state imposed the duty to make the statement. Although, of course, a requirement is preempted only if it is imposed by state law, *Worm II* expressly relied on the fact that the statements on which the express warranty claims were based were mandated by the EPA, not made voluntarily by the manufacturer. Our

decision in *Worm II* thus requires that we determine whether an express warranty claim is preempted by evaluating whether the statement was made voluntarily.

10. Assuming that Duvall's express warranty claim is not preempted in its entirety, Patricia Duvall's claim is not barred to the extent that Maryland law allows a loss of consortium claim to derive from an express warranty claim. We express no opinion on this question since the issue was not addressed by the parties.